## AFFIDAVIT OF JAMES FONTENEAUX

STATE OF TEXAS       §
                     §
HARRIS COUNTY        §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES FONTENEAUX, who, after being duly sworn, did depose and state as follows under penalty of perjury: "My name is JAMES FONTENEAUX. I am over 18 years of age and am competent to make this affidavit. My statements herein are based on my personal knowledge, and they are true and correct.

1. I am a fifty-five (55) year old African-American male and a proud father of four (4) children, ages 15 (twins), 13 and 12. I currently reside in Houston, Texas.

2. In May of 1976, shortly after graduating from college and completing my academy training as a Lieutenant in the United States Army, I accepted an offer to join Shell's Deer Park Manufacturing Complex (DPMC). I worked in Shell's Purchasing/Sales & Marketing organization at Shell's largest refining and chemical manufacturing facility.

3. From 1976 to late 1981, I held various strategic procurement positions in support of various Shell Chemicals and Oil Products' internal and external business enterprises. I also served on a cross-functional pre-sales consulting team, which reported directly to Shell's head office marketing & sales division. In addition to my duties of managing strategic supplier initiatives, I directly contributed into the creation of product direction and go-to-market strategies. In this position, my duties included creating product direction and go-to-market strategies for 28 independent and commercially ran business units within DPMC. In my final two (2) years with DPMC, I assumed responsibility for the contract negotiations, cost management, and relationship management of major engineering, construction and maintenance firms.

4. Between late 1981 and 1984, I undertook numerous strategic and consultative procurement positions in Shell Exploration & Production (E&P). In these positions, I managed a staff of procurement specialists and directly worked with Shell's administrative marketing and sales team to create the strategic integration and supply-chain process and strategy for a pool of 500 suppliers who were critical to the development of Shell E&P's gas production and ultimate go-to-market/sales strategy across Shell's California, Montana, Wyoming, Utah, and Texas customer base.

5. As an ancillary function, I served in a consultative capacity to assist Head Office E&P Marketing/Sales – Planning & Logistics to create and integrate the concept of Contract & Procurement into their facilities supply-chain framework. The objective was to lower the total cost of operations and, thus, providing the basis to enhance Shell's E&P's value chain, overall market position, and competitive advantage. Among other activities connected with automating supply inventories, I assisted key production sites, wherein I formulated the strategy roadmap for unique value-added supplier relations with major suppliers such as National Oilwell, Cameron Iron, Brown & Root, Pullman Kellogg, and Baker Tools.



EXHIBIT "A"

6. In late 1982 and early 1983, I served as a consultant to develop and implement a start-up procurement and financial service in support of a multi-billion dollar exploratory drilling project in Alaska. At this time, I also worked closely with Shell's head office to create logistical planning for customer sales in Shell's Pipeline division.

7. In 1984, after the successful launch of the Shell Alaska Venture, I received a position as Material Control Supervisor in New Orleans to Shell Offshore, Inc. (SOI). In this position, I managed a 20-person staff and was responsible for offshore materials logistical planning and managing an $800 million inventory control budget for offshore terminals and onshore production facilities.

8. From 1988-1990, I served as Supervisor over several Strategic Procurement roles and took on numerous strategic supplier relations initiatives for various major projects. As a member of SOI'S President Cost Reduction Initiative, I led a task group to rationalize Shell's supplier base, wherein I created unique teaming and partnering relationships, including development of partnering methodologies, performance metrics and balanced scorecard to effect continuous improvement. As part of the initiative, I conducted intensive interviews with over 250 major suppliers, including Halliburton, Schlumbeger, Foster Wheeler Engineering, Jacob Engineering and a host of manufacturing and fabrication facilities, to assess their marketing & sales capabilities, costing models, products and sales delivery systems, and channel partners network.

9. Before leaving SOI, I represented Shell by serving on the board of Junior Achievement and New Orleans Parkway Partners.

10. In 1990, I was assigned to the Information Center in Houston as a Senior Contract & Procurement Representative to undertake various assignments, but the most important responsibility was to assist in developing a supplier relations model similar to what I had created in E&P. During that time, Shell's IT supplier management process was in a state of disarray and was headed up by a former Shell Marketing & Sales employee with no procurement background.

11. From 1991-1996, I assumed a position as Senior Advisor to several non-procurement managers. I ultimately assumed strategic management responsibility for Shell's top ten (10) IT suppliers, including IBM, Computer Associates, AMDAHL, Mircosoft, Oracle, EMC, Hewlet Packard, Price Waterhouse, and Anderson Consulting.

12. In 1996, I received Shell's coveted *"President's Excellence Award"* for my contribution to strategic partnering with IBM, one of our largest IT suppliers. I also received over ten (10) awards for my concentrated work to develop the first ever formal approach to strategically managing IT suppliers, including a process to ensure new entry suppliers across the broader IT industry.

13. From 1990-1997, I worked closely with hundreds of IT suppliers, both strategic and non-strategic to Shell, most strategic to Shell. Eventually, I became Senior Advisor to the IT Executive Leadership.

14. In late 1997 and early1998, Shell Services International (SSI) was designed to be a global profit & loss start-up business. SSI was borne out of Royal Dutch Shell's (RDS) Leadership vision of a commercially ran IT organization that would be capable of sustaining itself in a global IT market place. With IT assets estimated in excess of a billion dollars and estimated 8,000 plus IT staff strategically aligned in countries where Shell operated, the vision was tested from late 1997 to 2000.

15. Prior to SSI, IT services were provided to internal Shell Companies via a shared internally ran cost-based model. The cost of IT was borne mainly by Shell's core businesses (i.e. Exploration & Production, Chemicals and Oil Products). Simply stated and under the cost-based model, a CIO would set the IT direction for his/her respective core business and collaborate cross-functionally with other CIO's and strategic procurement to employ cost-effective ways to strategically align IT supplier(s) with short and long-term business objectives. The ultimate strategy was to lower the total cost of ownership.

16. In 1997, I was specifically requested by a Shell Vice President to bid for and fill a Senior Leadership position in the newly formed SSI because "I had reached expert status in my field of work in Shell; namely Contract & Procurement and Supplier Relations." I was a Senior Advisor to Shell at the time.

17. Weeks before the SSI Sr. Leadership position was posted internally, my manager Mr. Niekirk met with me and advised me that, because of the global nature of the Senior Leadership position, he thought it would be wise for me to consider a less challenging position. As Mr. Niekirk put it, "taking on a US assignment would be best as no Black has, or probably never will, managed an international staff in RDS." I took this to mean that Blacks would not be accepted in a Parent company, RDS, which was located in Europe.

18. To date, there have been no other African-Americans in a leadership position at RDS.

19. Notwithstanding my obvious qualifications, Mr. Niekirk's voiced his belief to me that my undertaking the SSI Senior Leadership position would undoubtedly threaten the company record of an all white ran leadership team.

20. About a week later, I received a call from Mr. Niekirk advising me that the SSI senior leadership assignment would be posted externally to attract experienced individuals with broader marketing, sales and consultative skills, in order "to meet the challenge of developing SSI into a commercially viable and high-grade Information Technology (IT) Company."

21. After the SSI senior leadership assignment was posted internally and externally, Mr. Niekirk informed me that I made the short list. Mr. Niekirk also informed me that out of 40 plus candidates, I was more qualified than the external pool. Yet, Mr. Niekirk was still reviewing internal candidates.

22. Mr. Nierkirk met with me a week or so after compiling a shortlist of candidates for the SSI senior leadership. He then reiterated his view regarding the parent company's

3

image of not having Blacks in leadership and generally stated that because of obvious sensitivities, he [Mr. Neikirk] was considering internal candidates. He then stated that he was considering Kevin Fronk and Steve Magaldi – white males with substantially fewer years with the company and less IT experience and/or exposure, if any, than myself.

23. During this time, I had accumulated fourteen (14) years of experience in Shell's Exploration & Production, Oil Products and Chemicals business and had amassed over seven (7) years of experience in IT.

24. Fortunately for me, a SSI VP intervened after learning that Mr. Neikirk was considering awarding the position to other less qualified candidates (Steve Magaldi and Kevin Fronk) and urged Mr. Niekirk to award the SSI Senior Leadership position to me. Mr. Niekirk then reluctantly awarded the SSI Senior Leadership position to me but withheld the corresponding grade level two (2) and salary. I learned later that my senior leadership colleagues, who had also posted for their respective positions, were appropriately awarded their level two (2) grade level and corresponding salary.

25. I then complained to HR over Mr. Neikirks apparent decision to treat me differently than my peers (listed below), but my complaint fell deaf ears.

| Alan Clarke | Carl Crites | Sue Brightman-Glover |
| Colin Bailey | Billy Euell | Cindy Miller |
| Bronwyn Malignaggi | Sandie Rennie | Melanie Rippentropp |
| Rick Turner | Steve Clearwater | Piet van Dijken |
| Martin van Vliet | Rod Ownes | Barry Morrow |
| Johan Krebbers | Paul Cove | John Cole |
| Pat Welsh | | |

I also complained throughout my employment of racial harassment and racial slurs.

26. I became the first African-American to manage an international staff in RDS, as shown Contract & Procurement (C&P) and Supplier Relations Manager.

27. In 1998, I took yet another step towards strengthening Shell's overall relations with IT suppliers and presented my Global IT Contract & Procurement and Supplier Relations idea, an organization that still exists to this date and emerged as a Strategic Relations & Procurement (SR&P) blueprint.

28. From 1998 until 2000, the entire SSI Leadership team, including myself, spent countless hours of intense market analyses to build a foundation from which to launch SSI. In the SSI Senior Leadership position, I traveled over 200,000 miles internationally, built a global staff and further developed my vision of an intense IT strategic supplier relations model.

29. Framing the SSI business model would prove to be much more complicated to execute than the high-level vision formulated by Shell's leadership. Because of SSI's obvious attachment to Shell's Oil & Gas brand, developing the SSI business model would prove to be a

unique challenge when competing against IT companies with established market presence and brand. Equally challenging was a goal set by Shell Leadership for SSI to generate enough external IT business to sustain itself financially with the underlying target of lowering its dependency on Shell's core businesses.

30.  In short SSI, under the leadership of the then CEO, Lorin Brass, took on the difficult task of establishing a commercially viable IT Services company estimated to start-up with a net worth of over a billion dollars. The effort to build SSI required a demand for seasoned individuals with in-depth knowledge of Shell's internal customer blueprint, broad market knowledge of the IT industry and good perspective of external customer targets.

31.  The start-up process began with the creation of a Sales & Marketing line of Business (LOB), Contract & Procurement LOB, Strategy & Strategic Relations LOB and various IT LOBs such as Infrastructure Services and Applications Development.

32.  In late 1999, the vision of SSI began to dissipate and in 1999 and 2000, Shell went through the process of dismantling SSI. As a result, most of the SSI employees lost their job title and position. Mr. Jay Crotts, an IT VP and a very close friend of Mr. Alan Matula, CIO of the RDS Group, also lost his SSI job title and position.

33.  It was during this time the position of SRM was posted. This position was identical to the position I held while under SSI. I was the most qualified person for this position because I not only performed the duties of this position while under SSI but I also conceptualized, created and implemented the framework for this position. I applied for this position but was rejected.

34.  Instead, Mr. Matula awarded the position to Jay Crotts, a white individual who was clearly less qualified because he did not have either a procurement or sales background. Jay Crotts was awarded this position long before Mike Rose became the CIO. Although I was more than qualified for this position, I believe I was discriminatorily denied the opportunity to apply for and receive this position because of my race.

35.  The dismantling of SSI created a journey back to a shared IT cost model called Shell Information Technology International (SITI). SITI was a rather simple shared cost based internal IT service model for Shell. Essentially, the goal of SITI was to find ways to manage a surplus of IT staff developed in support of an aggressive SSI start-up model.

36.  From 1999 until 2000, I undertook a special assignment to design and develop the commercial strategy to acquire a $300 million outsourcing contract. As co-architect, I was instrumental in developing the overall framework and strategy proposal, as well as the teaming and operating agreement for alliance with a major outsourcing service provider to augment SSI's service capabilities. I also assumed the role of backup negotiator for very complex negotiations.

37.  From 2000 to 2002, I was appointed to head up Shell's Procurement initiative as North America's Global Supplier Recruitment Manager. This was a worldwide joint venture between Shell and 20 plus major partners. In addition to designing a supplier recruitment

strategy, the initiative required me to interface with over a 1000 suppliers to understand their overall business capabilities, including their product offerings, distribution and technology strength, and pricing models.

38. In 2001, Mike Rose was hired by Shell as CIO. Mike Rose did not develop nor implement the idea of Strategic Relations at Shell. Sadly, as a new CIO, Mike Rose, was unfamiliar with the Shell environment and he introduced a pseudo sales model called Shell's "IT Vision" (ITV), which was previously rejected by his previous employer HP. The ITV was eventually dismantled by the business CIO's. The only surviving component of ITV, outside of the business CIO's central IT role, was Procurement, the piece that remained intact under the leadership of Contract & Procurement, an organization that I conceptually designed and implemented.

39. In 2002, a few months after joining what was functionally called Strategic Relations & Procurement (SR&P), I met with Mr. Jay Crotts to discuss a job opportunity. As Mr. Crotts put it, this would be yet another opportunity to get me reconnected with the C&P and Supplier Relations organization that I successfully developed and operated under the SSI banner.

40. In June 2002, I was appointed as the Strategic Relations Manager for Microsoft and the Oracle Corporation and provided the strategic leadership for worldwide planning, development and implementation of initiatives to strengthen supplier-management practices, revitalize Shell Group companies' trust and accountability, and improve IT business cost performance. I was called upon by the Leadership to design and develop the operating framework for greater extraction of value-added supplier services and capabilities that effectively complimented the critical business needs of key stakeholders and overall business objectives of the company.

41. In late 2002, Mr. Crotts informed me that I should seek his SR&P position because he was being offered a CIO position. Mr. Crotts stated that he felt that I had both the broad procurement experience and knowledge of supplier sales schemes to manage the position. Mr. Crotts stated that he felt I was the best qualified candidate for the position since I had almost single-handedly designed the very foundation on which SR&P was being developed. Mr. Crotts also stated that the role would be an opportune time for me to expand on my vision and ideas to further enhance supplier value to the broader Shell companies. Mr. Crotts, who was also acting in a country managing position for SITI, also felt that my appointment would also demonstrate SITI's and Shell's commitment to diversity. I then informed Mr. Crotts that I would accept the position.

42. Mr. Crotts then spoke with Mike Rose, RDS CIO, about the idea of me acquiring his SR&P position and he informed me that Mr. Rose was in agreement. However, Mr. Crotts also conveyed to me that he spoke to Mr. Matula about me receiving the position and Mr. Matula, then CIO of Oil Products, was opposed to the idea. Mr. Crotts informed me that Mr. Matula would more than likely takeover Mr. Rose's CIO position because of growing organizational performance issues; mainly low staff morale because of SSI's demise and a IT Vision model that was loosing favor with Shell's core businesses.

43. Mr. Crotts also inform me that Mr. Matula was driving the SR&P posting and devising a plan that he [Jay Crotts] did not support. Mr. Crotts stated that if not managed properly, Mr. Matula's plan could potentially backfire politically and severely damage Mr. Matula's career.

44. Mr. Crotts stated, "chances are, you [me] have already heard about some of the rumors about Alan – this one could be a bombshell that I hope he [Mr. Matula] will have sense enough to avoid." It was well known at that time that Mr. Matula was in an intimate relationship with Kristine Moore.

45. In late 2002 and early 2003, I inquired about the status of the SR&P job posting. I informed Mr. Crotts that I had not received any form of status update on the position. Mr. Crotts response was that "no news was good news." In early 2003, I inquired again about the status of the SR&P posting and this time Mr. Crotts informed me that the SR&P posting had apparently been railroaded by Mr. Matula.

46. The next time I inquired about the SR&P posting, I received information that Kristine Moore (white-female) was named as Jay Crotts' replacement to the SR&P position effective sometime in July 2003, almost a year after I first inquired about the position. Ms. Moore received a double promotion to this position, but had no experience in IT, supplier relations and procurement for the Manager Strategic Relations and Procurement. Even Rose, the individual who selected Moore testified under oath that Moore did not have the requisite procurement experience need for this position. Moore had minimal sales experience and had no knowledge of the existing SRM position. I, on the other hand, had extensive sales, IT, and procurement experience and had great knowledge of the SRM role as I had previously held the position.

47. Moreover, there was no indication that the SR&P Job Posting was ever closed out within the normal 14 day calendar window for whatever reason. Additionally, there was no announcement that a panel had been put in place to review candidates for the SR&P Posting, if it happened at all. There was also no indication that the SR&P posting job criteria changed materially or was modified in any manner and rebroadcasted. Finally, there is no indication as to how the SR&P posting applicants were screened or notified of interviews, if it ever happened at all.

48. I was clearly more than qualified for this position than Ms. Moore; however, I was discriminatorily denied the opportunity to apply for and receive the promotion to this position because of my race and age. Ironically, I had to train Moore when she was promoted into the Manager of Strategic Relations & Procurement.

49. I was also discriminatorily denied at least four prior promotions. Specifically, I was denied promotions to the following positions: (1) Category Manager- IT Software; (2) Category Manager- IT Hardware; (3) Manager Strategic Relations & Procurement; and (4) Manager of Strategic Relations & Procurement.

7

50. The Category Manager – IT Software required extensive contract and procurement experience on a global level. During this time, I had been employed with Shell for 28 years and had 14 years experience in global contracting and procurement. I was clearly qualified for this position. A novice, Ashley Bates (white-male under forty years of age) filled the Category Manager- IT Software position. Bates had no global experience in contracting and procurement and had only been working with Shell for four years, I had been employed with Shell for almost three decades and had 14 years experience in global contracting and procurement. In fact, I previously trained Bates and had to subsequently assist Bates on a global contract with a major vendor because Bates was unqualified for the position.

51. The Category Manager – IT Hardware position required extensive contract and procurement experience on a global level. I was clearly qualified for this position, as I had 14 years experience in global contracting and procurement. The Category Manager – IT Hardware position was also filled by a novice, Cindy Knox (white-female under forty years of age). Knox had no global experience in contracting and procurement and no IT procurement experience. I, on the other hand, had been working in global procurement, contracting and IT for the previous 14 years at Shell.

52. The Manager Strategic Relations & Procurement position required extensive experience in IT, procurement and supplier relations. I had almost three decades of experience with Defendants, which included extensive work in procurement, supplier relations with major vendors, management, sales and consulting experience. The Manager Strategic Relations and Procurement position was filled by Jay Crotts (white male). Rose testified in his own deposition that Crotts did not have the requisite experience for this position and was clearly unqualified; yet, I was denied the promotion and Crotts was selected over me. Crotts had absolutely no experience in procurement and supplier relations. However, I had almost 24 years experience with Shell, which included extensive work in procurement, supplier relations with major vendors, management, sales and consulting experience.

53. I was also discriminatory denied a promotion to the SRAM position. I was more qualified for this position than all the selectees. Outside sales experience was never a requirement for this position. Still, I clearly had the requisite sales experience for the SRAM position. From 1998 until 2001, I provided these outside services in IT and sales to external business while I worked under SSI.

54. The SRM and SRAM positions were identical. Rose did not implement a new strategic relations program or strategic relations idea that had not already in existence at Shell. In fact, the strategic ideas Defendants allege Rose sought to implement were rejected by Rose's previous employer, HP. Furthermore, these strategic ideas were never implemented at Shell. The SRM position had long been posted, implemented and effectuated at Shell years before Rose's employment with Shell. Furthermore, Human Resources at Shell admitted that the SRM and SRAM positions were so identical that, in all actuality, Moore was not authorized to rename the SRM position to SRAM.

55. The truth of the matter is that the job responsibilities and duties remained the same for these positions and nothing changed in SR&P. Therefore, I was more than qualified to

perform the duties of the SRAM position. Moreover, the selectees for the SRAM positions were less qualified than me. Ann Perrin (white female) and Jane Dancer (white female) were the first hires for the SRAM position. Ann Perrin's resume clearly shows she did not have the 10-15 years experience required for the SRAM position. Jane Dancer too was unqualified for the SRAM position, as she too did not have the requisite 10-15 years experience. Steve Hamil (white male) was a SRM hired into the SRAM position, despite no outside sales experience and less seniority than I had.

56. I held the SRM position and had almost three decades worth of experience with Shell, which included extensive IT, supplier relations, procurement, management, sales and consulting experience at the time. Yet, I was denied the SRAM position. I undoubtedly and clearly was the more qualified than the employees selected for the SRAM positions.

57. My non-African-Americans counterparts also received more favorable treatment than I did as I was paid a lower wage than my non-African-American counterparts who held the same or similar position as I did. Specifically, Rick Downes (white male), Randy Segotta (white male), Jan Dancer (white female) and Ann Perrin (white female) were paid up to 38% more than me for the same SRM position. During this time, I had seniority over each of these employees and more experience.

58. I was also denied the same pay grade for an identical position held by Steve Magaldi (white male) and Kevin Frank (white male). Again, I had seniority over these employees and had more experience but paid less.

59. When Moore replaced the existing SRM employees with new SRAM employees, she assisted all of my white counterparts with obtaining other positions within Shell, but refused to assist me because of my race and age. As a result, I was the only SRM employee terminated.

Affiant sayeth further not."

_____
James Fonteneaux

This instrument was acknowledged before me on June 11th 2007
by _____.

_____
Notary Public's Signature

VANISIA COLBERT
Notary Public, State of Texas
My Commission Expires
January 09, 2011

9